FEE PAID
S/I

FILED
CLERK, U.S. DISTRICT COURT
10/4/24
CENTRAL DISTRICT OF CALIFORNIA
BY      MRV      DEPUTY
DOCUMENT SUBMITTED THROUGH THE
ELECTRONIC DOCUMENT SUBMISSION SYSTEM

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

VIVEK SHAH,
    Plaintiff,

v.

JPMORGAN CHASE BANK, N.A.,
    Defendant.

Civil Action No. 2:24-cv-08601-WLH(Ex)

JURY DEMANDED

## VERIFIED COMPLAINT

### NATURE OF THE ACTION

1.    Round #2. As-if this bank didn't learn from its previous mistakes (and highly likely that it doesn't really care), it violated ECOA's notice requirements yet once against Plaintiff. After Defendant's ("Chase") motion to dismiss was denied as to Plaintiff's ECOA notice and Illinois Consumer Fraud and Deceptive Practices Act in *Shah v. JPMorgan Chase Bank, N.A.,* No. 20-cv-3355 (N.D. Ill. 2020), the parties entered into a stipulation of dismissal. Now, several years later, it repeated its misconduct by revoking Plaintiff's credit card and not informing him why it did so.

2.    Plaintiff once again brings this action to address Defendant's unlawful conduct and to redress the harm he has suffered and will continue to suffer as a direct result of that conduct, absent relief.

### PARTIES

3.    Plaintiff Vivek Shah is a citizen of California and resident of Los Angeles, CA. His principal place of residence is 640 S Curson Ave #1910, Los Angeles, CA 90036.

4. JPMorgan Chase, N.A. is an American multinational investment bank and financial services holding company headquartered in New York, NY. JPMorgan Chase is ranked by S&P Global as the largest bank in the United States and the sixth largest bank in the world by total assets of US$2.687 trillion. It is a federally chartered bank with its principal place of business at 200 White Clay Center Drive, Newark, Delaware 19711.

5. In acting or omitting to act as alleged herein, Chase was acting through its employees and/or agents and is liable on the basis of the acts and omissions of its employees and/or agents.

6. In acting or omitting to act as alleged herein, each employee, officer or agent of Chase was acting in the course and scope of his or her actual or apparent authority pursuant to such agencies, or the alleged acts or omissions of each employee or officer as agent were subsequently ratified and adopted by Chase as principal.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this matter under 15 U.S.C. § 1691e and 28 U.S.C. § 1343.

8. This Court has supplemental jurisdiction over the state laws claim in this action under 28 U.S.C. § 1367(a) because it is also related to the federal claims asserted against Chase so that it forms part of the same case or controversy under Article III of the U.S. Constitution. The Court furthermore has jurisdiction over the state law claim in this action under 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000 and is between citizens of different States.

9. This Court has authority to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Fed. Rules of Civ. P.

10. Venue is proper in this district under 28 U.S.C. § 1391(b) because Chase is a national bank that is chartered and supervised by the Office of the Comptroller of the Currency, an agency in the U.S. Treasury Department, pursuant to the National Bank Act. Chase has bank branches throughout this district where Plaintiff has transacted with Chase. Plaintiff is a resident of Los Angeles, CA. A substantial part of the events and omissions giving rise to the claims occurred in this district.

## FACTUAL BACKGROUND

### I. Chase's Prior Conduct Leading to a Previous Suit

11. In or around October 2019, Plaintiff was added as an Authorized User to the following credit cards issued by Chase:

   a. United Explore MileagePlus, with the primary account holder being his father

   b. British Airways, with the primary account holder being his mother

   c. Chase Sapphire Card, with the primary account holder being his brother

12. On or around February 1, 2020, Plaintiff applied with Chase for a credit card ("Chase Credit Card").

13. On or around February 4, 2020, Plaintiff successfully opened a Business Checking Account under his own name at Chase.

14. On or around February 15, 2020, Chase denied Plaintiff's Chase Credit Card application and generated a false Statement of Reasons claiming that Plaintiff had insufficient credit history, when in fact Plaintiff had sufficient and substantial credit history with one of the highest credit ratings in the nation.

15. On or around April 4, 2020, Plaintiff applied for a Paycheck Protection Program ("PPP") loan with Chase under the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), 15 U.S.C. § 116, et seq..

16. On or around April 17, 2020, Chase issued a letter to Plaintiff denying his PPP loan request, stating: "After a recent review of your accounts, we have decided to end our relationship with you." It generated such false Statement of Reasons, despite all of Plaintiff's prior accounts with Chase having been maintained in stellar condition.

17. On or around April 17, 2020, Chase issued a letter to Plaintiff's father, mother, and brother stating that it had closed the cards that were issued to Plaintiff as an Authorized User. It did not provide any reason whatsoever as to why the cards were terminated.

18. On or around April 20, 2020, Plaintiff applied for an Amazon Prime Rewards Visa Signature Card ("Amazon Card") with Chase.

19. On or around April 21, 2020, Chase issued a letter to Plaintiff regarding his Business Checking Account, which stated: "After a recent review of your account, we have decided to end our relationship with you."

20. On or around April 22, 2020, Chase approved Plaintiff's Amazon Card application with a $6400 credit line.

21. On or around April 24, 2020, Plaintiff again added himself as an authorized user on his father's United Explore MileagePlus credit card as well as his mother's British Airways credit card. New cards were issued to Plaintiff for both credit cards.

22. On or around June 1, 2020, Chase closed Plaintiff's Amazon Card under the guise that:1) there was a "rapid increase in revolving balances" and 2) there were "too many requests for credit or reviews of credit." Chase sent the letter despite the Amazon Card balance being paid

in full on or before its due date, and there being no new information/credit-pull from which it could have determined that there were too many requests/reviews of credit. In fact, Plaintiff had on occasion even made *overpayments* of the balance due and thus has had a *negative* Amazon Card balance.

23. On or around June 1, 2020, Chase again sent letters to Plaintiff's father and mother, stating that it had closed the cards that were issued to Plaintiff as an Authorized User. It yet again did not provide any reason whatsoever as to why the cards were terminated.

24. On or around June 2, 2020, Plaintiff contacted Chase's customer service and requested it to reconsider and reinstate the Amazon Card

25. On June 4, 2020, Chase issued a letter denying reinstatement of the Amazon Card, yet again, under the same guise that: 1) there was a "rapid increase in revolving balances" and 2) there were "too many requests for credit or reviews of credit." In fact, on the very day of the denial letter, the Amazon Card had a current balance of *negative* $85.81. In the history of the Amazon Card, Plaintiff at most utilized just 16.25% of the approved credit limit. Moreover, Chase did not check any of Plaintiff's credit reports again through which it could glean new information that could form the basis of the denial.

II. **Chase's Conduct Leading to the Present Suit**

26. On or around July 24, 2024, Plaintiff applied for a United Explorer Card that is issued by Chase. Minutes later, he was notified by Chase that his credit card application was approved with a $17,600 credit limit.

27. Following are some of the benefits that came with the card: 1) 7x total miles on United flights, 2) 2 United Club one-time passes per year, 3) Free first checked bag and Priority boarding on United flights, 4) Up to $100 Global Entry, TSA PreCheck® or NEXUS fee credit,

5) 25% back on United inflight and Club premium drink purchases, 6) No foreign transaction fees, 7) Travel and purchase coverage, and 8) One year complimentary DashPass membership with DoorDash.

28. When Plaintiff received the United Explorer Card in the mail, he began immediately using it and started paying off his balance in full, usually multiple times a month rather than waiting till the due date.

29. On or around October 1, 2024, Plaintiff received an email from Chase stating: "Financial institutions have an obligation to know our customers and monitor account activity. After careful review, we made a decision to close your account(s). We sent you the information in a letter through U.S. Mail. It should arrive within the next few days."

30. On or around October 3, Plaintiff received a letter in the mail from Chase – dated "September 23, 2024" – that stated: "After careful consideration, we decided to close your account on 10/19/2024 because of your association with a Chase credit card, deposit or investment account that was previously closed."

31. Plaintiff has neither had an investment account with Chase, nor has he been associated with any Chase investment accounts.

32. As a result of Chase's closure of the United Explorer Card, Plaintiff lost access to all the card's benefits, including the $17,600 credit limit.

## CHASE'S CHECKERED HISTORY OF LEGAL VIOLATIONS

**I. Federal Criminal Law Violations:**

33. In January 2014, Chase entered into a *nolle prosequi* agreement with the United States for a $1.7 billion penalty stemming from two felony violations of the Bank Secrecy Act.

34. In January 2017 Chase pled guilty in the District of Connecticut to one felony count of conspiring to manipulate the price of U.S. dollars and euros exchanged in the foreign currency exchange (FX) spot market, in violation of 15 U.S.C. § 1. Chase was placed on a 3-year term of probation and $550 million in fines. Presumably, its term of probation expired in January 2020.

**II. Civil Law Violations:**

35. In June 2010, Chase paid $48.6 million to settle claims by Great Britain's financial regulator that the bank's London unit failed to maintain required separation between customers' accounts.

36. In July 2010, Chase paid $25 million to settle claims that it sold unregistered securities to a state-run municipal money-market fund that suffered a run on deposits because it held defaulted debt.

37. In April 2011, Chase settled claims that the bank over-charged active or recently active military service members on their mortgages by paying $27 million in cash to approximately 6,000 military personnel, by lowering interest rates and fees in excess of that permitted by the Service Members Civil Relief Act ("SCRA") and the Housing and Economic Recovery Act of 2008 ("HERA") on soldiers' home loans, and by improperly foreclosing upon homes owned by borrowers protected by SCRA and HERA. Thereafter, additional borrowers were added to the class and Chase agreed to pay an additional $8 million into the settlement fund.

38. In June 2011, Chase paid a penalty to the United States Securities and Exchange Commission ("SEC") of $153.6 million to settle charges that it failed to disclose material information to investors in collateralized debt obligations.

39. In July 2011, Chase paid the SEC $228 million to settle charges that it fraudulently rigged at least 93 municipal bond transactions in 31 states, generating millions of dollars in profits.

40. In August 2011, Chase paid the U.S. Treasury Department $88.3 million to settle claims that it improperly processed transactions in violation of sanctions laws against Cuba, Iran and the Sudan.

41. In February 2012, Chase agreed to pay $110 million to settle claims that it over-charged customers for overdraft fees.

42. In March 2012, Chase paid $150 million to settle claims that it imprudently invested pension funds in a risky debt vehicle.

43. In March 2012, Chase paid the federal government a $45 million fine to settle a False Claims Act lawsuit that alleged it illegally charged veteran borrowers hidden fees on refinanced home loans backed by the Veterans Administration.

44. In April 2012, Chase paid $20 million to settle claims by the Commodity Futures Trading Commission that the bank improperly extended credit to Lehman Brothers based, in part, on commingled customer funds that it was required to keep separate.

45. In November 2012, Chase paid $296.9 million to the SEC to settle claims that the bank misstated information about the delinquency status of mortgages that served as collateral for a securities offering underwritten by the bank.

46. In December 2012, the United States District Court for the Southern District of New York granted final approval of a $43 million settlement of individual actions against JPMorgan Chase and another financial institution, as well as numerous other providers and

brokers, alleging antitrust violations in the market for financial instruments related to municipal bond offerings.

47. On January 7, 2013, Chase settled claims with the Office of the Comptroller of the Currency ("OCC") and the Federal Reserve Bank providing for the termination of the Independent Foreclosure Review programs that had been required under the Consent Orders with such banking regulators relating to its residential mortgage servicing, foreclosure and loss-mitigation activities. Under the settlement, the Chase agreed to make a cash payment of $760 million into a settlement fund for distribution to qualified borrowers. Chase also committed an additional $1.2 billion to foreclosure prevention actions under the settlement, which were to be be fulfilled through credits given to it for modifications, short sales and other types of borrower relief.

48. In July 2013, Chase paid $410 million to the Federal Energy Regulatory Commission to settle claims of bidding manipulation of California and Midwest electricity markets.

49. In September 2013, Chase agreed to pay $80 million in fines and $309 million in refunds to consumers who were billed for credit monitoring services that it never provided.

50. In September 2013, Chase also paid $920 million in fines to the Securities and Exchange Commission ("SEC"), the Federal Reserve Bank, the OCC, and the United Kingdom's Financial Conduct Authority to settle claims of mismanagement with respect to its oversight of traders involved in the "London Whale" disaster which caused losses of approximately $6 billion.

51. In October 2013, Chase paid a $100 million fine to the Commodity Futures Trading Commission and admitted to reckless conduct and market manipulation.

52. On October 25, 2013, Chase agreed to resolve, for $1.1 billion, litigation with Fannie Mae and Freddie Mac concerning mortgage repurchase obligations.

53. On November 15, 2013, Chase settled claims for $4.5 billion with 21 major institutional investors to make a binding offer to the trustees of 330 residential mortgage-backed securities trusts issued by Chase and another financial institution.

54. On November 19, 2013, Chase and the U.S. Department of Justice ("DOJ") reached a $13 billion settlement with Chase to resolve federal and state civil claims arising out of the packaging, marketing, sale and issuance of residential mortgage-backed securities ("RMBS") by JPMorgan, Bear Stearns and Washington Mutual prior to Jan. 1, 2009.

55. On December 2013, Chase reached a settlement with the European Commission regarding its Japanese Yen LIBOR investigation concerning antitrust rigging of benchmark interest rates and agreed to pay a fine of €79.9.7

56. In December 2013, Chase paid $22.1 million to settle a lawsuit alleging that the bank imposed expensive and unnecessary flood insurance on homeowners whose mortgages the bank serviced.

57. In January 2014, Chase paid a $350 million Civil Money Penalty to the OCC in connection with its violations of the Bank Secrecy Act.

58. In January 2014, Chase also paid a $461 million Civil Money Penalty to the Financial Crimes Enforcement Network ("FinCEN") for failure to detect and adequately report suspicious transactions conducted by Bernard Madoff.

59. In January 2014, Chase also paid $218 million to settle a class action brought by Bernard Madoff victims.

60. In January 2014, Chase also paid $325 million to settle claims brought by the Bernard Madoff trustee.

61. In February 2014, Chase agreed to pay $614 million to the U.S. government to settle claims that it defrauded the Federal Housing Administration, the United States Department of Housing and Urban Development, and the United States Department of Veteran.

62. On March 25, 2014, Chase agreed to settle a class action alleging that it failed to pay overtime to its business bankers.

63. On March 27, 2014, Chase and the bankruptcy trustee for Peregrine Financial Group, Inc. agreed to a $15 million settlement of claims against Chase alleging Chase allowed fraud to occur at Peregrine, which was bankrupted after its founder looted hundreds of millions of dollars from customer accounts.

64. On April 23, 2014, Chase agreed to pay $5.5 million to settle claims made by a class of nearly 480,000 Circuit City rewards credit card holders who alleged Chase duped them into joining an "interest free" program, then breached their contract by charging class members unexpected fees and interest charges.

65. On May 1, 2014, a Chase's subsidiary, JP Morgan Securities, LLC, agreed to settle claims brought by the state of New Jersey, Division of Consumer Affairs and Bureau of Securities, alleging that it allowed unregistered agents to accept orders for the purchase and sale of securities.

66. On May 2, 2014, the United States District Court for the Eastern District of New York gave preliminary approval to a settlement of $280 million to resolve claims against Chase that it misled investors in billions of dollars' worth of mortgage backed securities.

67. On July 15, 2014, a federal court approved a roughly $2.25 million settlement between Chase and a class of consumer who alleged that Chase charged them late fees on their mortgage payments even when they were on time.

68. On October 8, 2014, Chase agreed to pay up to $12 million to settle claims that certain of its tellers and other bank employees – a total of approximately 145,000 employees in 12 states – were not paid proper wages or overtime because Chase did not count some hours worked.

69. On October 10, 2014, Chase agreed to pay $2.4 million to resolve claims that it illegally misclassified commercial real estate appraisers as exempt workers in order to avoid paying them overtime.

70. In November 2014, Chase agreed to pay nearly $1 billion to U.S. and U.K. regulators who alleged that Chase, and others, manipulated the $5.3-trillion-a-day currency market.

71. On January 22, 2015, Chase settled claims by the Consumer Financial Protection Bureau and the Maryland Attorney General alleging that Chase steered customers to a now-defunct Maryland title company in exchange for undisclosed kickbacks and data on potential customers in violation of federal consumer protection laws.

72. On April 2, 2015, Chase agreed to settle claims that it failed to pay overtime and provide proper breaks to a California class of underwriters.

73. On May 28, 2015, Chase agreed to pay over $500 million to settle a lawsuit arising from Bear Stearns - which Chase purchased in 2008 - for the sale of $17.6 billion in toxic mortgage backed securities.

74. On July 17, 2015, Chase agreed to pay $388 million to settle claims by investors who alleged that Chase misled them about the safety of $10 billion worth of residential mortgage backed securities.

75. On July 29, 2014, Chase agreed to settle charges brought against it by the Commodity Futures Trading Commission for filing inaccurate reports to the agency from 2012 and continuing even after the charges were brought against Chase.

76. On January 31, 2015, Chase agreed to pay $99.5 million to settle claims by a class of investors who alleged that Chase, along with twelve other banks, conspired to rig the $5.3 trillion-a-day foreign exchange market.

77. On August 12, 2015, a federal court approved a settlement of a nationwide class action against Chase for its use of robocalling in violation of the Telephone Consumer Protection Act.

78. In October 2015, Chase entered into a $10.2 million settlement for a nationwide class of persons who were "robodialed" by Chase in violation of the Telephone Consumer Protection Act.

79. On October 14, 2015, Chase agreed to settle charges with the SEC that it violated a rule prohibiting firms from taking part in public stock offerings after short selling the same stocks.

80. On October 29, 2015, Chase settled a multi-district litigation alleging that Chase and eleven other market participants rigged the credit-default swaps market.

81. On November 2, 2015, Chase agreed to pay $100 million in restitution and penalties to settle a lawsuit by the California attorney general against Chase over the bank's

consumer credit card debt-collection practices, including allegations it was "robosigning" thousands of documents.

82. On December 15, 2015, Hong Kong regulators fined Chase $3.87 million for various regulatory failures relating to internal controls on short-selling, dark pool trading, and other types of trading.

83. On December 18, 2015, Chase agreed to settle claims with the SEC and the CFTC for failing to disclose conflicts of interest while steering clients into its own hedge funds and mutual funds.

84. On January 4, 2016, Chase entered into a consent order with the Office of the Comptroller of the Currency to pay a $48 million fine for its violations of a 2011 consent order with the OCC arising from its "robosigning" of loan documents and other unsafe and unsound banking practices.

85. On January 6, 2016, Chase's brokerage business agreed to settle charges with the SEC that it falsely misled its clients about how its brokers are compensated.

86. On January 19, 2016, Chase reached a class action settlement on behalf of Chase's shareholders who alleged suffering losses as a result of the bank's supplying false and misleading statements concerning the risks and losses arising from the secret proprietary trading activities of the "London Whale," a rogue London-based Chase trader who caused the bank to suffer $6.2 billion in losses.

87. On January 25, 2016 Chase settled two outstanding disputes with Lehman Brothers Holdings Inc. and certain of its affiliates in which Lehman alleged, inter alia, that Chase coerced several billion dollars from Lehman on the eve of its bankruptcy, draining Lehman of virtually all liquidity and leading a bank run that ultimately led to Lehman's bankruptcy.

88. On July 8, 2016, Chase agreed to pay at least $216 million and reshape its credit card debt collection operations as part of a settlement with the Consumer Financial Protection Bureau, the Office of the Comptroller of the Currency and 47 states.

89. The above stated violations from 2010 to mid-2016 that Chase agreed and settled are only a select handful. Chase has agreed and settled to dozens more violations of the law, since 2016 till date, which ranged from banking violations to employment and non-employment discriminatory practices. For instance, on January 20, 2017, pursuant to a Consent Order entered, in the Southern District of New York, Chase resolved allegations by the United States that it had violated the ECOA, *inter alia*, when it discriminated African-Americans and Hispanics on the basis of race and national origin in the extension of residential credit and in the making of residential real estate-related loans through mortgage brokers, and agreeing to pay a $54.3 million civil penalty.

## INJURY TO PLAINTIFF

90. As a result of Chase's actions described above, Plaintiff has been directly and substantially injured. Plaintiff has been frustrated in his attempt to maintain and obtain credit.

91. As a direct and proximate result of Defendants' revocation of the United Explorer Card, Plaintiff lost a line of credit in the amount of $17,600, along with a lot of benefits that came with it.

92. Chase's unlawful actions described herein have been intentional, willful, wanton, outrageous, fraudulent, grossly negligent, malicious, and have been, and are, done with callous and reckless disregard for rights protected under federal and state law.

## CAUSES OF ACTION

**COUNT I – Failure to Provide Principal and Specific Reasons in Violation of the ECOA, 15 U.S.C. § 1691(d)(2); 12 C.F.R. § 1002.9(b)(2)**

93. Plaintiff repeats and incorporates by reference all allegations set forth in the paragraphs above.

94. ECOA and the regulations promulgated thereunder, require Chase to provide Plaintiff 1) the "principal" reason for the adverse action, and 2) that it be the "specific reasons" for the adverse action.

95. Chase revoked, terminated or otherwise changed the terms of the existing credit arrangement without a statement containing the principal and specific reasons for taking such action.

96. The revocation, termination or otherwise change in terms of the existing credit arrangement constitutes an "adverse action" within meaning of 15 U.S.C. § 1691(d)(6). Chase was a "creditor" within meaning of 15 U.S.C. § 1691a(e). Plaintiff was an "applicant" for each of the applications within meaning of 15 U.S.C. § 1691a(b).

97. Closing accounts without stating the principal and specific reasons casts doubts of discrimination. Consumers may never know whether race, color, religion, national origin, sex or marital status, age or other prohibited bases were involved. By failing to provide applicants the valid reasons, they may never know what remedial actions to take. Or worse, they might use the false reasons to their own detriment.

98. The ECOA adverse action notice requirement was enacted as "a strong and necessary adjunct to the anti-discrimination purpose" of the statute and to "fulfill[] a broader need: rejected credit applicants will now be able to learn where and how their credit status is

deficient and this information should have a pervasive and valuable educational benefit." S. REP. No. 94- 589, at 406, 408, 1976 WL 13838, at *4, *7 (Jan. 21, 1976).

99. In addition to discouraging discriminatory practices, the notice requirement is intended to provide consumers with a "valuable educational benefit" and to allow for the correction of errors "where the creditor may have acted on misinformation or inadequate information." *Tyson v. Sterling Rental, Inc.*, 836 F.3d 571, 576 (6th Cir. 2016) (*quoting* S. Rep. No. 94-589, at 4 (1976)).

100. Chase's acts and omissions constitute a violation of the ECOA and its implementing regulations under of 15 U.S.C. § 1691(d)(2).

**COUNT IV – California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, et seq.**

101. Plaintiff repeats and incorporates by reference all allegations set forth in the paragraphs above.

102. The UCL forbids "unlawful, unfair or fraudulent" conduct in connection with any type of business activity. Chase engaged in both unlawful and unfair conduct.

103. Unlawful, due to allegations stated above, specifically, violation of ECOA's notice requirements.

104. Unfair, because it closed the United Explorer Card for no reason. And although the terms of the credit card state that Chase can close an account for any reason, it may not legally do so in circumstances that violate the law. For example, it cannot legally close it in violation of various state and federal anti-discrimination laws such as ADA or Unruh Act. Similarly, it cannot legally close the account when the closure itself is unfair – since unfair acts and practices violate California law. The acts and practices are unfair because (1) the consumer

injury is substantial; (2) the injury is not outweighed by any countervailing benefits to consumers or competition; and (3) the injury could not reasonably have been avoided by consumers themselves. The conduct described above offends established public policy and acts and practices are immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers.

### DEMAND FOR JURY TRIAL

105. Under Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all issues triable as of right.

### REQUESTED RELIEF

106. Plaintiff respectfully asks that the Court grant him the following relief:

   a. Enter a declaratory judgment finding that the foregoing actions of Chase violate 15 U.S.C. § 1691 and California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, et seq..

   b. Enter a permanent private and public injunction:

      i. Enjoining Chase and its employees, agents, officers, and directors from further acts of similar conduct;

      ii. Directing Chase and its employees, agents, officers, and directors to provide Plaintiff with an ECOA-compliant statement of reasons; and

      iii. Directing Chase and its employees, agents, officers, and directors to take all affirmative steps necessary to prevent additional instances of such conduct or similar conduct from occurring in the future;

    c. Award compensatory damages against Defendant, to Plaintiff, in an amount to be determined by the jury that would fully compensate Plaintiff for injuries caused by the conduct of Defendant alleged herein;

    d. Award punitive damages, against Defendant, to Plaintiff, in an amount to be determined by the jury that would punish Defendants for their willful, wanton, outrageous, malicious, grossly negligent, and reckless conduct alleged herein and that would effectively deter similar conduct in the future;

    e. Award nominal damages;

    f. Award Plaintiff his reasonable attorneys' fees and costs under 42 U.S.C. § 3613(c)(2);

    g. Award prejudgment interest to Plaintiff; and

    h. Order such other relief as this Court deems just and equitable.

Dated: October 4, 2024

Respectfully submitted,

/s/ Vivek Shah

Vivek Shah
640 S Curson Ave #1910
Los Angeles, CA 90036

## VERIFICATION OF COMPLAINT

I, Vivek Shah, hereby declare under penalty of perjury that the foregoing facts contained in this Complaint are true and correct to the best of my knowledge.

Executed on October 4, 2024

/s/ Vivek Shah
VIVEK SHAH